TRUSTEES OF HILLSDALE COLLEGE *v.* WOOD.

1. WILLS—CONSTRUCTION—PRECATORY TRUSTS.

The essence of the doctrine of precatory trusts is that the words creating them, while in form the expression of a request, wish, or recommendation on the part of the testator, are, in fact, intended by him as a positive direction or command obligatory upon the person to whom they are addressed; and the doctrine has no application to a case where a husband, through an intermediary, deeds property to himself and wife in entireties, and makes a will providing that the bulk of his property shall go to a certain charity in case he survives her, and requesting, in case she survives him, that she shall, by gift before death, or by will operating after death, dispose of the property in accordance with the terms of his will.

2. TRUSTS—ESTABLISHMENT—EVIDENCE—SUFFICIENCY.

On the issue whether there was an oral agreement between testator and his wife that, in consideration of his conveying property to himself and her jointly, she would, in the event of her surviving him, dispose of the property thus conveyed in accordance with the terms of his will, evidence examined, and *held*, insufficient to establish such agreement.

Appeal from Ingham; Wiest, J. Submitted April 12, 1906. (Docket No. 55.) Decided July 23, 1906.

145 MICH.—17.

Bill by the trustees of Hillsdale College against Clark C. Wood, executor of the last will and testament of Jesse C. Ferris, deceased, and others, to obtain a construction of said will. From a decree dismissing the bill, complainants appeal. Affirmed.

*F. A. Lyon*, for complainants.

*Edward Cahill*, for defendants.

Blair, J. The bill of complaint in this case was filed to obtain a construction of the will of Jesse C. Ferris, deceased, and of deeds whereby, through defendant Clark C. Wood, as intermediary, Mr. Ferris conveyed his home in Lansing to himself and Harriet M., his wife, as tenants by entireties, and praying, among other things:

"That the said Clark C. Wood, as executor of the estate of the said Jesse C. Ferris, may be held and decreed to hold said property, including said real estate, as a trust fund to carry out the provisions of the will of the said Jesse C. Ferris."

Mr. Ferris, who was a retired minister of the gospel, had lived with his wife in Lansing for many years. They were both active and zealous members of the Free Will Baptist Church. Mr. Ferris owned the home in which they lived, appraised after his death at $3,000, and a moderate amount of personal property. Mrs. Ferris owned a farm of 75 acres, appraised at $3,750. In accordance with a long-cherished desire and plan, approved of by his wife, Mr. Ferris executed a will June 5, 1889, giving to his wife a life estate in his property and, after her death, giving a small amount to his church and the bulk of the property to Hillsdale College. March 7, 1899, Mr. and Mrs. Ferris each executed a will. Mrs. Ferris' will gave the use of all her property to her husband during his life and after his death bequeathed $1,000 to her church and various sums to other legatees, but made no provision for Hillsdale College. Mr. Ferris' will gave his property to his wife for life and after her death the bulk

·of the property to the Lansing church and to Hillsdale College. Neither Mr. nor Mrs. Ferris, who was his sec-·ond wife, had children, and Mr. Ferris had no near rela-tives. On the 23d of June, 1900, the will and deeds in ·question in this suit were executed. Defendant Wood testified:

" Mr. and Mrs. Ferris were both present, and Mr. Ferris told me what he wanted to go into the will, accord-ing to my best recollection. I also drafted the will of Harriet M. Ferris, dated the 7th day of March, 1889. On the 23d of June, 1900, the date that I drafted the will for Mr. Ferris, I also drafted a deed from Mr. and Mrs. Ferris to myself of some real estate belonging to Mr. Ferris. I cannot say who was present when Mr. Ferris directed me to draft that deed. He gave me that direc-tion substantially at the same time he directed me to draft his will. * * * I have had a great many con-versations regarding the disposition of this property, and at which particular one these directions were given I am unable to say. * * *

" Q. Had Mr. Ferris at that time any other real estate than such as he there described in this deed ?

"A. As I learned after his death, but did not know at that time, he still held the legal title to a lot in North Lansing which had been sold on a contract.

" Q. Can you tell how this [second will] came to be made, why he was not satisfied with it and wanted to draw another one ?

"A. Yes. Mrs. Ferris had always a great fear that she might be left dependent in her old age, and after the will was drawn, giving her a life lease of the property, they reached the conclusion, I judge by what they told me afterwards, that the life use of the property might not answer her purposes. There was at the same time in her mind, too, another will dispute that they had been in previ-ously, and a great dread of courts in regard to wills, a dis-pute that arose over a relative of hers who had died, and be-·tween the two of them they came to me and told me they wanted to give that property absolutely to her, and wanted me to tell them how they could make an arrangement to do that and make as little for the courts to act on in the matter as possible. Of course, I am only giving·in a gen-·eral way what they said to me. So I told them that, if

they wanted to make sure that in case Mrs. Ferris survived him the property and real estate went to her, if they chose, they could take the estate by entireties and bind it in that way, then it would become at once the property of the survivor. Then we discussed the changes that would be necessary in the will itself to dispose of any other property that there might be, and they were made accordingly, so that the bequests to all the other legatees under the will he had conditioned on his surviving her. And then this deed was made to me by them, and I deeded it back to them as husband and wife. * * *

" *Q.* Then these deeds were made simply to make sure that she would have the use of that property ?

"*A.* No, sir.

" *Q.* What was it for ?

"*A.* To give her the absolute ownership of that property. I recognized that simply and purely as a request and not intending to be binding or conclusive upon her in any shape or manner.

" *Q.* Did they say so ?

"*A.* Yes, sir; over and over again in their discussions. Not at this particular time, but in talk at other times both prior to and at the time the will was drawn had they told me to put it in in that way. * * *

" *Q.* Did she ever speak to you afterward about making a will to carry out that ?

"*A.* No, sir.

" *Q.* It was the understanding that she would, wasn't it, at that time ?

"*A.* Nothing except what is stated right there. There was no further discussion that I know of. I don't know that there was another word ever said about it.

" *Q.* Wasn't it agreed by her that she would make that in the will ?

"*A.* No such agreement that I ever heard of.

" *Q.* It was her intention to do it at that time, wasn't it ?

"*A.* I don't know, I didn't know it was. She never said anything of the kind to me.

" *Q.* Do you recollect of having some conversation with Mr. Kelley about the matter ?

"*A.* Yes.

" *Q.* Didn't you tell him she had lost her mind and could not make a will, but if she recovered again you would see to it that she made that will ?

"*A.* I don't know that I ever said I would see to it. I scarcely would have told him that I would see to making a will. I might have said that I would see that it was brought to her attention.

" *Q.* Why were you going to see to it that it was called to her attention if there wasn't any understanding that she should make that in the will?

"*A.* Because her husband's request was there and I would think it no more than proper at least, as executor of his will, and for another reason, that all matters relating to his property should be brought to her attention.

" *Q.* Didn't you say to Mr. Kelley in that conversation that that was their understanding that she should make a will and dispose of whatever there was left?

"*A.* I don't know. I have no recollection of exactly what I did say to him.

" *Q.* You would not say that you did not say that to him?

"*A.* No. I would not say that I did not say that—that that was my idea of their understanding.

" *Q.* And didn't you also tell me that the first time I talked with you about it?

"*A.* It is possible.

"*Mr. Cahill:* That is your understanding of it yet, isn't it?

"*A.* That is my understanding of it yet."

The will of June 23, 1900, contained the following provisions, among others, viz.:

"After the payment of all my just debts and funeral expenses, I give, devise and bequeath to my beloved wife, Harriet M. Ferris, should she survive me, all my real and personal property of which I may die possessed, of every kind, name and nature whatsoever.

"Should my wife, Harriet M. Ferris, not survive me, then it is my will that my executor dispose of all my property, both real and personal, and apply the proceeds thereof as follows:

"*First.* I given and bequeath to George Baken, of Leslie, Ingham county, Michigan, the sum of one hundred dollars ($100).

"*Second.* To Delia Havens, of Gratiot county, Michigan, I give and bequeath the sum of one hundred dollars ($100).

"*Third.* To the First Free Will Baptist Church of the

City of Lansing, Ingham county, Michigan, also known as the 'Park Free Baptist Church,' I give and bequeath the sum of one thousand three hundred dollars ($1,300), provided that the First Free Will Baptist Church shall deliver up for cancellation a certain note given by me and held by it.

"*Fourth.* All the rest, residue and remainder of my estate I give and bequeath to the trustees of Hillsdale College, in the city of Hillsdale, county of Hillsdale and State of Michigan, said sum to be held and invested by the trustees as a perpetual fund, the principal of which shall forever keep inviolate and the income thereof shall be used under the direction of said board of trustees for the purpose of aiding needy and deserving young men who are studying for the work of the ministry in the Free Baptist Churches and other evangelical churches. * * * Should my wife, Harriet M. Ferris, survive me, then, as hereinbefore stated, all of the foregoing bequests shall be held to be null and void and my entire estate, both real and personal, is hereby given and bequeathed absolutely to her, but it is my request that she shall, either before her death by gift, or in such other manner as she shall deem proper or after her death by will, transfer, grant and give to the foregoing legatees the sums and amounts hereinbefore set forth out of whatever may remain of the proceeds of my property, real and personal, over and above what she may have used, or desire to use, during her lifetime, for her own maintenance, or for other purposes to which she may desire to apply it."

Mr. Ferris died July 21, 1901, aged about 80 years. A few weeks before the death of her husband, Mrs. Ferris became mentally incompetent and so continued till the time of her death on June 2, 1904. The circuit judge, after hearing the proofs in open court, entered a decree dismissing the bill, but filed no opinion, and we are therefore not informed as to his reasons. Complainants have appealed from the decree to this court.

Complainants' counsel contends that complainants were entitled to a decree for the following reasons:

1. That the will of Mr. Ferris creates a precatory trust in favor of his legatees.

2. That the will and the deeds are contemporaneous writings, parts of one transaction to be construed together as though contained in the same instrument, and, construed in the light of the surrounding circumstances, they create a precatory trust in favor of the legatees. ·

3. That the deeds were made upon express contract that, in consideration thereof and of the will, Mrs. Ferris would dispose of the property, or so much thereof as remained at the time of her decease, in favor of her husband's legatees.

There is no sufficient basis under the proofs in this case for the application of the doctrine of precatory trusts to the real estate in question. The real property was not disposed of, nor intended to be disposed of, by the will, except in the event that the testator survived his wife. The very purpose of the deeds was to avoid a contest of her title which might arise in case she derived her title from her husband's will. A present interest was conveyed by the deed and the parties actually intended that their effect should be that which the law impressed upon them. The essence of the doctrine of precatory trusts is that the words creating them, while in form the expression of a request, wish, or recommendation on the part of the testator, are, in fact, intended by him as a positive direction or command obligatory upon the person to whom they are addressed. In the case before us, the testator had no legal authority, independent of contract, to direct by will what disposition should be made of this real estate. Mrs. Ferris was not a party to the will and had no control over it. Mr. Ferris could have changed it or revoked it at any time regardless of her wishes, and it is manifest that if he intentionally gave her a title to this property by deed, he could not, without an agreement on her part, change that title by his will.

It is contended, however, that there was an oral agreement between Mr. Ferris and his wife that in consideration of the deeds Mrs. Ferris should dispose of such portion of her husband's property as remained at the time of her death, in accordance with his will. The burden of

proof was on the complainants to sustain their contention in this regard, and for this purpose they called the defendant Clark C. Wood as a witness in their behalf, whose testimony on the subject of the agreement has been hereinbefore quoted. The testimony of Mr. Wood does not support the contention that an agreement was made. On the contrary, he testifies that the deeds were made to give Mrs. Ferris the absolute ownership of the property in case she survived, and that the request in Mr. Ferris' will was not intended to be binding upon Mrs. Ferris, as they both repeatedly told him. The most that can be claimed for his testimony is that he told complainants' counsel and Mr. Kelley that he had an idea that they had an understanding that she would carry out his request and that he still had that idea or understanding. But he expressly testified that he never heard of any such agreement, and we cannot treat his conjecture or understanding, not derived from the parties or based upon facts disclosed, as overthrowing his positive testimony. The evidence disclosed by the record indicates that Mr. Ferris relied upon his wife's affectionate regard for his wishes rather than upon a binding agreement. Doubtless, if she had retained her mental faculties, she would have complied with his request. Unfortunately, her mind failed before the time arrived for action on her part.

The decree of the circuit court is affirmed, with costs of this court.

CARPENTER, C. J., and MCALVAY, GRANT, and MOORE, JJ., concurred.